DONNELLY, Respondent, vs. PACKARD, Appellant.

*October 19—November 15, 1921.*

*Physicians and surgeons: Malpractice in setting broken limb: Evidence: Sufficiency.*

In an action against a physician for malpractice, while setting a fracture of the left femur, in not bringing the broken surfaces of the bone together and maintaining them in apposition during the healing period, the evidence is *held* to sustain a finding of the jury that defendant failed to exercise that degree of skill and care ordinarily exercised by physicians in good standing in the locality of his residence, and that such failure was the proximate cause of plaintiff's condition.

APPEAL from a judgment of the circuit court for Oneida county: A. H. REID, Circuit Judge. *Affirmed.*

The appeal is from a judgment in favor of the plaintiff for the sum of $3,764.85 and costs in an action for malpractice.

The plaintiff, a laborer forty-six years of age, while em-

ployed on a road construction job ran his plow against a large boulder in such a manner as to cause an oblique fracture of the upper third of the femur of his left leg.

The issues presented were submitted to a jury upon a special verdict, in which, among other things, the jury answered and found:

1. That the defendant in setting the fracture did not bring the broken surfaces of the bone together and maintain them in apposition during the healing period.

2. That the defendant failed to exercise that degree of skill and care ordinarily exercised by physicians in good standing in the locality of Rhinelander in so treating said fracture.

3. That the failure on the part of the defendant to use skill and care was the proximate cause of the condition of the plaintiff's left thigh at the time of the trial.

4. That one year would have elapsed after the accident before the plaintiff could have resumed his ordinary work in case there had been proper care and treatment.

The jury then fixed plaintiff's damages at the sum of $5,000.

Prior to the commencement of this action the plaintiff had recovered compensation under the workmen's compensation act from his employer, and the jury having found that but for the alleged malpractice the plaintiff would have been able to resume work in twelve months, the defendant was entitled to the benefit of this payment to the extent that the compensation was based upon such malpractice, and the verdict was accordingly reduced by the trial court from $5,000 to $3,764.85.

The defendant's assignments of error are:

1. That the court erred in refusing to direct a verdict for the defendant.

2. That the court erred in refusing to change the answers to the special verdict and to order judgment for the defendant.

3. That the court erred in denying defendant's motion for a new trial.

The determination of this case therefore involves an examination of the evidence in the case for the purpose of ascertaining whether or not there was credible evidence in support of the verdict. A review of the evidence will be found in the opinion.

For the appellant there was a brief by *Lines, Spooner & Quarles* of Milwaukee and *E. D. Minahan* of Rhinelander, and oral argument by *Charles B. Quarles*.

For the respondent there was a brief by *J. & M. Van Hecke* of Merrill, and oral argument by *John Van Hecke*.

DOERFLER, J. Plaintiff testified that the injury occurred on September 26, 1918; that he was taken from his home to St. Mary's Hospital in the city of Rhinelander; where his fractured limb was temporarily placed in a splint by Dr. Meyer of Eagle River. The defendant was thereupon called in to attend the plaintiff, and, according to defendant's testimony, he properly set the fracture in such a manner as to place the fractured surfaces of the broken femur in apposition, as was shortly thereafter demonstrated by an X-ray examination.

Plaintiff also testified that prior to the setting of the bone Dr. Meyer inquired of the defendant whether it would not be a good idea to perform an open operation on the injured limb and upon the two fragments of the bone so as to shorten the bones and the injured limb, and to then re-attach the upper and lower surfaces of the bones by means of a plate and other appliances used in operations of that nature. To this inquiry, according to the plaintiff, the defendant made no reply, and the method suggested was not pursued.

After setting the bone the defendant applied an apparatus known as Buck's extension, the object thereof being to produce a traction on the lower fragment of the limb so as to keep the two injured surfaces in apposition and to prevent

the lower injured surface from slipping up onto and over the injured surface of the upper fragment. The limb itself was placed in a splint, surrounded by bandages.

For some time after the injury the defendant visited the plaintiff in the hospital daily. About ten days after the accident the plaintiff expressed to the defendant his regret that Dr. Meyer's advice with respect to the open operation and the application of a plate had not been followed, and he also inquired of the defendant whether any other method could then be pursued which might result in the shortening of plaintiff's injured limb so as to compensate for a shortening resulting from two prior fractures of the femur in plaintiff's right limb. The plaintiff substantially testified that *Dr. Packard* then said to him that he could take the weight off (meaning the Buck's extension) and let the injured surface of the lower fragment of the bone run up over the injured surface of the upper fragment. The plaintiff also testified that the extension was thereafter removed and that the defendant did nothing thereafter to hold the injured surfaces in proper position, excepting only to put the injured limb into a steel cage known as a pneumatic ambulatory splint, which is made for the purpose of allowing the patient to be moved.

The defendant testified in substance that this splint, by means of bands, is fastened to the limb and to the body, and that the bands are inflated with air so as to constitute a pneumatic cushion, the object of these bands being to hold and maintain the limb in a straight and firm position; that at the bottom of the splint, near the location where the ankle would be placed, there is an apparatus which when applied will produce the necessary traction, producing an effect similar to that brought about by the Buck's extension. Such traction, according to the testimony of the defendant, was applied at the time the plaintiff's limb was placed in this splint. The claim of the defendant that traction was applied when the ambulatory splint was used is expressly denied by

both the plaintiff and his wife, both of whom testified that after the Buck's extension was removed the limb was loosely placed in the ambulatory splint without applying any traction whatsoever.

The defendant in his testimony admits that at or about the time that the Buck's extension was removed there was some talk between the parties about a method to be pursued in order to produce a shortening of the left leg. It is significant also that in the answer of the defendant the following paragraph appears:

"Defendant alleges that prior to the time when the said accident occurred to the plaintiff, the plaintiff had sustained an accident causing a fracture of the femur of the right leg, and that the result of the said accident was that the said right femur united in an overlapping position, causing a considerable shortening of the said right leg, and that when the defendant was employed to attempt to set and heal the said broken femur he was requested by the plaintiff to allow the said femur to shorten, in order to compensate for the shortening in the other leg and make the two legs about equal in length, and that for this reason the said left femur was allowed to unite in such position."

This answer of the defendant was interposed after the application for compensation had been heard and determined by the industrial commission, and after defendant's counsel had received proper information from the defendant with respect to everything that had transpired in connection with the injury and the treatment by the defendant of the injured limb.

The plaintiff further testified that immediately after the removal of the extension the injured surfaces of the bone became very sore, and that he thought he could feel the lower fragment running up the injured surface of the upper fragment.

On or about the 21st of October, 1918, on account of the prevalence of influenza in and around Rhinelander, it was thought advisable by the defendant to have the plaintiff re-

moved from the hospital to his home. The defendant claimed that the Buck's extension was removed about two to three days before the time of plaintiff's removal to his home, and that immediately thereafter the pneumatic ambulatory splint was applied in proper form and was permitted to remain upon plaintiff's injured limb until some time after the beginning of the new year following. The plaintiff was conveyed to his home from the hospital, a distance of about fourteen miles, over rough country roads, in a truck automobile, unaccompanied by either the defendant or by any other physician or a skilled attendant.

The plaintiff claims, and this is substantially undisputed, that for a period of about two weeks after the plaintiff arrived at his home the defendant did not visit him or make an examination of his limb, and that after the lapse of about two weeks the defendant called upon plaintiff and upon examining the limb stated that he ought to have attended to plaintiff's limb before; that the same was in a pretty bad condition. Thereafter the defendant did not visit the plaintiff until on or about the 1st day of January, 1919, at which time the defendant advised plaintiff that he should make use of his limb. Plaintiff attempted to stand on the limb with the aid of crutches, and in the month of March, 1919, attempted to walk with the aid of a crutch and a cane.

As the result of the injury the left limb shows a very marked bow, and the condition of the limb is such as to disable the plaintiff from doing any considerable amount of walking or work and to cause him a great deal of pain, and it is practically undisputed that the condition as so detailed will remain permanent.

On or about the 25th day of March, 1919, prior to the hearing of the application for compensation before the industrial commission, the plaintiff visited Dr. Lemon, a physician and surgeon in the city of Milwaukee, who examined plaintiff's left limb and some X-ray photographs taken of such limb at or about that time, and plaintiff testi-

fied that Dr. Lemon said to him: "What did they try to do to you?" To which the plaintiff answered: "They tried to shorten my leg." Dr. Lemon then said: "That is an awful way to shorten a leg; if they wanted to shorten your leg why didn't they take off the ends of these bones and shove your leg together and give you a square union; then you would have had a solid leg." Plaintiff further claimed that in that conversation with Dr. Lemon the latter criticised *Dr. Packard's* method of treatment. This alleged conversation with Dr. Lemon was denied by him in his testimony.

Dr. R. T. Welch of Rhinelander was called as a witness for the plaintiff, and testified that he had lived there twenty-two years and had practiced his profession since 1895; that he made an examination of plaintiff's limb at the time his application was heard before the industrial commission; that in his opinion the limb could have been shortened with good results, but that in order to do a good job it would have been necessary to have performed the open-surgery operation above referred to; that in the absence of a weight, in an oblique fracture such as the plaintiff had, there occurs a slipping by of the ends of the bones; that the object of the weight is to prevent such slipping; that the leg could be shortened by taking off the weight and letting the parts slip by the way they did, but not with good results; that such a practice was not in accordance with what a physician and surgeon would ordinarily resort to; that the plaintiff's condition will remain permanent; that instead of the broken surfaces having joined, the two fragments of the bone have entirely overlapped and have formed an adhesion on the outer surfaces of the fragments instead of at the injured surfaces. The testimony as to the union of the bones and the condition thereof was based upon an examination of X-ray photographs submitted to the witness. The witness further testified that ordinarily, with proper treatment and with the use of the weight for a sufficient length of time, the

condition found in plaintiff's injured left limb would not have been produced; that the apparent bowing of the left limb is due to the outward displacement of the lower fragment; that at the time of plaintiff's removal from the hospital to his home he should have been attended by some skilled attendant; and that an ordinarily skilled surgeon attending the case would have known that the fragments had passed.

Dr. W. F. Meyer, a witness for the plaintiff, had been an active practitioner for upwards of twelve years and had considerable experience in limb-fracture cases. The witness corroborated plaintiff's testimony as to the conversation between himself and the defendant with respect to the advisability of resorting to the open operation and the use of the plate, etc. He also pronounced the latter method as the practical and ordinary way to shorten a limb injured as was the plaintiff's. He examined the plaintiff's limb immediately after the accident, and the second time about three or four weeks prior to the trial in the lower court. He testified that the X-ray exhibits indicated that the fractured parts of the femur had united along the sides of the bones and not on the broken surfaces. In other words, that the unbroken surfaces of the two fragments are in apposition to one another; that in moving a patient a distance of fourteen miles in the manner in which the plaintiff was moved, the patient should have been attended, and examined when he arrived at his destination, and that the failure to do so was not good practice on the part of the physician. Dr. Meyer also testified that there is no bending of the bones, but that there is a double width of the bone, and that such condition gives the limb the appearance of having been bowed. In all other respects he substantially corroborated the testimony of Dr. Welch. Both Dr. Welch and Dr. Meyer testified that it is not safe, in a fracture like the plaintiff's, to take off the traction until there is a union of the fractured

surfaces, and to have taken it off, as testified to by the plaintiff and his wife, was bad practice from the standpoint of a physician and surgeon.

On rebuttal Dr. Welch testified that with proper treatment ninety per cent. of fractures such as the plaintiff had would result in a serviceable limb. Dr. Meyer, on rebuttal, fixed between eighty per cent. and ninety per cent. as the reasonable recoveries from injuries like the plaintiff's.

For the defense there appeared Dr. Charles H. Lemon, a physician and surgeon of Milwaukee, with a long experience in the treatment of fractures. He testified that upon examination of the X-ray photograph it would appear that there had been an overriding of the bones about three quarters of an inch; that according to the rule established by the American Surgical Association, anywhere between one quarter to one inch in shortening in a fracture of a thigh is considered good surgery. He denied that the X-ray photograph showed a union of the two fractured bones along the sides thereof, but testified that the bones had united at the fractured surfaces. He further testified that the proper use of the pneumatic ambulatory splint is in accordance with the standard practice of the profession. He further pronounced the open operation and the use of the plate as one of the most formidable operations in surgery, which is frequently followed by infection, and he therefore was opposed to such method. In his opinion, after the plaintiff used the limb subsequent to January 1st, it sagged at the point of the fracture and bent because the muscles on the inside of the leg tend to pull the leg towards the inside like the strings of a bow. He pronounced the results achieved by the defendant as a fair average produced by the ordinary, skilful physician, and stated that out of one hundred similar cases treated by physicians forty per cent. would produce results substantially like those in plaintiff's case.

Dr. E. A. Smith, a physician and surgeon of many years of practice and experience and a specialist in X-ray work, substantially corroborated Dr. Lemon's reading of the X-ray

plates in evidence and as to the conditions as they appeared to him as disclosed by such plates. The defendant also, in reading the X-ray photographs, corroborated substantially both Doctors Lemon and Smith.

It appears from the evidence that only one familiar with X-ray examinations and photographs can competently decipher and interpret the same.

It therefore appears from the evidence that there is a sharp conflict in the testimony:

First. As to whether or not traction was removed from the limb before the adhesion of the bones.

Second. As to whether traction was applied when the Buck's extension was removed and the pneumatic ambulatory splint used.

Third. As to whether the bones have united on their sides or whether they have united on the broken surfaces.

Fourth. As to whether the condition found in plaintiff's limb, manifested by the bowing, was due to the adhesion of the bones, as testified to by plaintiff's experts, or whether it is the result of conditions which came about subsequent to January 1, 1919, when plaintiff was advised to and did attempt to resume the use of his injured limb.

If the plaintiff's testimony is to be believed, and we are of the opinion that it is supported by ample credible evidence, then the jury was fully warranted in answering the questions of the special verdict in the manner in which it did. We are also of the opinion that the portion of the answer above set forth is a powerful admission and corroboration of plaintiff's claim, but that independent of such allegations there is ample evidence to sustain the finding of the jury.

The learned circuit judge in his opinion stated that "After much study of the exhibits it still seems to the court that experts might reasonably disagree as to what these exhibits show in this regard, and that there was therefore a jury question presented, and that the jury's finding thereon ought not to be disturbed."

Such opinion of the trial court, as above set forth, meets

with our approval. The outstanding fact remains that the results are most deplorable and that the plaintiff will remain in a crippled condition as herein described for the remainder of his life. There being ample testimony to prove that the defendant failed to exercise that degree of skill and care ordinarily exercised by physicians in good standing in the locality of his residence, and that such failure was the proximate cause of the plaintiff's condition, the judgment of the lower court must be affirmed.

*By the Court.*—The judgment of the lower court is affirmed.